IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| JOHANNA KIM and ERNEST K. HO, | ) ) ) | CIVIL NO.  05-00332 JMS/LEK |
| Plaintiffs, | ) ) | |
| vs. | ) ) ) | ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO DISMISS AND FOR PARTIAL SUMMARY JUDGMENT |
| JAMES E. POTTER, in his capacity as the Postmaster General, United States Postal Service, | ) ) ) | |
| Defendant. | ) ) ) | |
| _____ | ) | |

## ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO DISMISS AND FOR PARTIAL SUMMARY JUDGMENT

## I.  INTRODUCTION

Plaintiff Johanna Kim filed suit against Postmaster General John

Potter alleging that the United States Postal Service (1) unlawfully discriminated

against her due to her disabilities and (2) failed to reasonably accommodate her

disabilities.  Defendant Potter filed a motion to dismiss the claims and for partial

summary judgment.[1]  For the following reasons, the court GRANTS IN PART

---

[1] Defendant Potter moved for summary judgment as to all of Plaintiff Kim's claims except for those set forth in paragraph 25 of her First Amended Complaint.  Paragraph 25 reads:
> Kim has been denied equal employment opportunities on a continuing basis since December 3, 2005 when Kim was reassigned from a temporary limited duty assignment in Manual PL 373 by a faulty

(continued...)

AND DENIES IN PART the Defendant's Motion to Dismiss and for Partial

Summary Judgment.

## II. <u>BACKGROUND</u>

**A.**          **Factual Background**

Plaintiff Johanna Kim ("Kim") was a Distribution Clerk for the

United States Postal Service ("USPS").  Kim began working for the USPS

Honolulu Processing and Distribution Center in 1986, first as a Mail Processor

and then as a Mail Processing Clerk with a bid position in Pay Location ("PL")

341, the Mechanized Flat Distribution Division.  Kim's work in PL 341 included

lifting and emptying large flats and bundles into the mail processing system and

moving full tubs of mail and packages, all of which required prolonged standing,

bending, twisting, overhead work, and the ability to lift 30-40 pounds.

In July 2000, Kim strained her cervical and lumbar regions when she

"twisted to look behind her while seated in a chair during a training session."[2]

Def's. Ex. D at 1.  Kim's injury allegedly affected her neck, shoulders, and upper

---

[1](...continued)
> rehabilitation job offer which permanently assigned her in Automation
> PL 389 under circumstances similar to those for which she filed her
> previous EEO Complaint which underlies this action.

Pl's. First Am. Compl. ¶ 25.

[2]  Kim reportedly also suffered previous workplace injuries in 1995 (when she was hit by
a piece of equipment) and in 1998 (when she hurt her back lifting a tub of mail).

and lower back.  Medical assessments regarding Kim's ability to engage in various tasks show some improvement over time.  In August 2000, shortly after her accident, Kim's physician recommended restricting the type and amount of work that Kim was to perform over the subsequent two-week period, including no lifting, pushing, or pulling materials over 15 pounds; no walking for over 30 minutes; no excessive bending, twisting or pulling; no overhead work; and no prolonged sitting or gripping objects with both hands.  Def's. Ex. B at 1.  In December 2002, the USPS referred Kim to a Work Capacity Assessment at St. Francis hospital.  According to the results of this assessment, Kim's physical abilities had improved, even if only slightly.  In contrast to the August 2000 limitations, the 2002 assessment concluded that Kim could now "complete the following non-material handling activities on a frequent basis: Sitting, standing, walking, stair climbing, ladder climbing, bending, stooping, squatting, crouching, kneeling, crawling, twisting, side bending, and over head reaching," but was occasionally restricted in balancing, was to walk at a slowed pace, and needed to use railings to ascend and descend stairs and to use furniture to move into or from crouching, kneeling, or crawling positions.  Def's. Ex. D at 2, 4.  The report also stated that Kim was able to lift and carry 13 pounds on a frequent basis and 23 pounds on an occasional basis.  Def's Ex. D at 2.

3

For her part, Kim claims that at present she is "always in pain when she walks," but is able to walk for about 30 minutes at a slowed pace before the "pain and numbness force [her] to stop"; that walking quickly may trigger asthma attacks; that she is not permitted to lift more than twenty pounds or to undertake repetitive bending, squatting, kneeling, or hand movements; that she cannot sit, stand, or walk for any prolonged periods of time; that she cannot undertake twisting movements or engage in overhead work; and that she requires frequent rest breaks. Pl's. Decl. ¶¶ 17-22. Kim also claims that ignoring her restrictions worsens her condition and increases her pain. Pl's. Decl. ¶ 23. Finally, Kim states that her condition makes it difficult for her to cook; wash dishes; clean her house; drive; wash laundry; brush her teeth and hair; shower; go grocery shopping; use the restroom; and sleep. Pl's. Decl. ¶¶ 24-35.

Because of her injury, Kim was no longer able to perform the work in PL 341. Thus, in July 2000, the USPS temporarily transferred her to a post in PL 373, the Manual Distribution Division. Kim's responsibilities in PL 373 included sorting and repairing letters and mail which could not be processed by the USPS's automated system -- duties consistent with the restrictions recommended by Kim's physician. Milton Kokobun ("Kokobun"), the Manager for the Distributions Operations and Kim's second-level supervisor, periodically sent Kim letters to

confirm her medical restrictions and her assignment to PL 373, the Manual

Distribution Division.  Def's. Ex. C.  Although Kim's condition seemed to

improve somewhat over time, Kim did not make a full recovery.  The USPS

therefore continued to post Kim to PL 373, the Manual Distribution Division, for

the next four and one-half years.

Kim's coworkers in the Manual Distribution Division held bid

positions in PL 373.  In 2002, Kim's original pay location, PL 341, was abolished

and certain bid positions, including Kim's bid position, were reassigned to PL 389.

Although her bid position was reassigned to PL 389, Kim continued to work in PL

373, the Manual Distribution Division.  Kokobun's Decl. ¶ 6.  Kim claims that

starting in 2002, there were three full-time rehabilitation jobs available in PL 373

and that there were three USPS employees assigned to bid positions in PL 373

who worked elsewhere.  Kim's Decl. ¶ 65.  However, the USPS claims that it did

not change Kim's bid position to PL 373 because, under the Collective Bargaining

Agreement ("CBA") negotiated with the union, the USPS would have had first to

offer the vacant PL 373 position for bid and award it to the most senior qualified

candidate.  Kokobun's Decl. ¶ 5.  Kim thus continued to occupy a bid position in

PL 389 but worked on a temporary assignment in PL 373, the Manual Distribution

Division, from July 2000 to December 2005.  Kim's Decl. ¶ 66; Kokobun's Decl. ¶ 4.

Kim alleges that she was discriminated against, harassed, and subjected to disparate treatment due to her disability from January 2002 to the present.  She also claims that the USPS failed to reasonably accommodate her disability.  The facts underlying Kim's claims can be roughly grouped into five categories.

*Category 1: Administrative and Procedural Problems.*  Kim claims that the USPS failed to properly follow or implement various administrative procedures.  For example, Kim alleges that her supervisor Bonnie Tomooka ("Tomooka") failed to timely respond to Kim's March 24, 2002 request for leave to attend an April 13, 2002 class, forcing Kim to reschedule the class for another date; that approvals for her September 2002 request for leave under the Family Medical Leave Act took as long as two and one-half months to approve; that various mistakes were made in Kim's written limited duty paperwork in February 2003; and that the work limitation paperwork sent to her treating physician did not include a question regarding whether Kim could work in the presence of dust or fumes even though other coworkers' work limitation paperwork did so.  Kim's Decl. ¶¶ 56, 58-60.  Various other allegations of administrative snafus include that

6

management failed to issue written temporary limited duty assignments as required by federal regulations starting in January 2002; that Tomooka failed to give Kim a written temporary limited duty assignment in advance from March 2002 to May 2002; and that Kim claims to have been denied the opportunity to attend various safety talks because they were scheduled outside of her regular hours.

In this same general category are Kim's allegations that errors were made when processing Kim's paperwork, in some cases leading to inaccurate pay deductions or denial of benefits.  For example, Kim states that she was incorrectly charged for "leave without pay" in both March of 2002 and January of 2003, causing improper payroll deductions.  Kim's Decl. ¶ 57, 61.  It took almost two years for these improper deductions to be corrected and for Kim to be reimbursed. Kim's Decl. ¶ 61.  Kim also claims that she was incorrectly denied compensation for her July 25, 2001 disability claim because her Injury Compensation Manager, Alan Ueno, accidentally deleted it.  Kim's Decl. ¶ 62.  It took three years and nine months for Kim's claim to be corrected.  *Id.*

In responding to these errors, Kokobun explains that since Kim was assigned to one pay location but working in another, confusion, delay, and uncertainty sometimes arose regarding Kim's paperwork.  Kokobun's Decl. ¶ 8.

***Category 2: Denial of Holiday Work.***  From 2002 to 2005, Kim claims that the USPS wrongfully denied her the opportunity to work during various holidays, preventing Kim from earning the corresponding overtime pay. In 2002, Kim claims that she was wrongfully denied holiday work on Veterans Day, Columbus Day, and over a three-day Christmas holiday.[3]  Pl's. Decl. ¶ 52. Kim filed a grievance regarding the missed Columbus Day overtime work which was settled on March 26, 2004 when management agreed to pay Kim eight hours of overtime salary.[4]  Pl's. Ex. F at 1.  The record does not reflect that Kim filed any grievances regarding the missed 2002 holiday work on Veteran's Day or over the Christmas holidays.

In 2003, Kim alleges that USPS improperly denied her holiday work on Martin Luther King Day and President's Day.  Pl's. Decl. ¶ 52.  The record does not reflect that Kim filed grievances regarding this lost holiday work.

---

[3]  Plaintiff's counsel also alleges in his pleading papers (including the Plaintiff's First Amended Complaint and the Plaintiff's Memorandum in Opposition to the Defendant's Motion to Dismiss and for Partial Summary Judgment) that Kim was improperly passed over for the New Year's Eve 2002 holiday.  First Am. Compl. ¶ 13; Pl's. Mem. in Opp'n To Def's. Mot. to Dismiss and for Partial Summ. J. 3.  No mention of a denial of work on the New Year's Eve 2002 holiday is made in Kim's declaration or elsewhere in the supporting papers.

[4]  Kim's Declaration states that "the overtime work for [the] Christmas 2002 grievance was settled on March 26, 2004 . . . ."  Pl's. Decl. ¶ 55.  This appears to be a typo.  The grievance Kim filed was for missed Columbus Day work.  Pl's. Decl. ¶ 52.  Moreover, the exhibit referenced by Kim's Declaration addresses settlement of the Columbus Day grievance.  Pl's. Ex. F.

Kokobun claims that Kim's request for holiday overtime was denied for PL 389 (the pay location where Kim occupied a permanent bid position) because there was no work available that would comport with Kim's medical restrictions. Kokobun's Decl. ¶ 9. Kokobun also states that Kim's request for holiday overtime work was denied for PL 373 (the pay location where Kim worked) because the USPS's CBA with the union did not allow an employee assigned to one bid position to sign up for overtime in another section. Kokobun's Decl. ¶ 9. Kim questioned the accuracy of Kokobun's interpretation of the CBA, noting that she had done "overtime work" outside of her pay location in 1995 and 1996 and had never been told that doing so was against the CBA.[5] Pl's. Decl. ¶ 54.

In March 2003, the USPS reached an agreement with the union to make an exception to the CBA and permit Kim to sign up for overtime in PL 373. Following this, however, Kim was still passed over for certain overtime work -- some of which could be performed within her medical restriction -- in favor of other PL 373 employees. Between May and November 2003, Kim filed six union grievances relating to these missed holiday overtime opportunities, all of which the USPS and Kim have agreed to settle. Kokobun's Decl. ¶ 9.

---

[5] The applicable CBA provisions are not available to the court. Moreover, the court is not clear as to whether holiday work and overtime work are governed by the same CBA provisions.

In 2004, Kim claims to have been wrongfully denied work on President's Day and Columbus Day.  Pl's. Decl. ¶ 52.  The record does not indicate whether there was work available within Kim's restrictions on these dates.  The record also does not show whether Kim filed any grievances over these lost holiday work hours.

In 2005, Kim claims to have been improperly denied holiday work in December.  *Id*.  The record does not reflect what holiday work -- whether Christmas or New Years Eve -- Kim was denied, nor does it demonstrate that Kim was physically able to perform the available work.  There is no evidence that Kim ever appealed the denial of this holiday work through the union grievance process.

***Category 3: Lost Premium Pay Due to Out of Schedule Assignments.***  Next, Kim claims that she was improperly assigned "out of schedule" work causing her to lose hours at a higher base-pay.  A USPS employee's rate of compensation varies according to the time and day of the week worked; those days or time-slots compensated at a higher rate are termed "premium pay."  The record reflects that Tomooka and Kokobun changed Kim's work schedule on at least three different occasions, negatively impacting the amount of premium pay Kim received.  The first time Kim's work schedule was changed, she filed a claim on July 25, 2001 with the Department of Labor.  Pl's.

Decl. ¶ 40.  The Department of Labor later accepted Kim's claim and paid her for

fifteen months of lost premium pay.  Pl's. Decl. ¶ 42.

On July 26, 2001 -- a day after Kim filed her first complaint with the

Department of Labor -- Tomooka and Kokobun signed a limited duty assignment

for Kim which again changed her hours.  Prior to July 26, 2001, Kim's schedule

included Sunday hours, which were compensated at a higher rate of pay.  The new

work schedule approved by Tomooka and Kokobun did not include Sunday work.

Kim filed a grievance on August 7, 2001 regarding this change of schedule.  Pl's.

Decl. ¶ 40.  In December of 2001, Tomooka returned Kim to her former working

schedule.  Kim alleges that she lost approximately a year of wages over the period

of July 26, 2001 to December of 2001.  Pl's. Decl. ¶ 45.  Kim's grievance

regarding the lost Sunday work was settled on June 21, 2002 when Kokobun

awarded Kim 30 hours of lost wages.  Pl's Decl. ¶¶ 43, 45.

On June 22, 2002, the day after Kim's grievance regarding the lost

Sunday work was resolved, Tomooka once again assigned Kim out of schedule.

Pl's. Decl. ¶ 43.  Kokobun himself improperly assigned her out of schedule on

August 21, 2002 when he scheduled light duty employees for Thursday work

ahead of Kim (a limited duty employee) in violation of the CBA.  Pl's. Decl. ¶¶

48-50.  In fact, Kim alleges that she was "placed out of schedule continuously

11

every month from June 22, 2002 to December 2, 2005." Pl's. Decl. ¶ 46.  These

out of schedule assignments resulted in sum totals of 4.5 hours of lost premium

pay for Sunday work; 3.5 hours of lost premium pay for Monday work; 3.5 hours

of lost premium pay for Tuesday work; 8 hours of lost premium pay for Thursday

work; 3.5 hours of lost premium pay for Friday work; and 3.5 hours of lost

premium pay for Saturday work.   Pl's Decl. ¶¶ 46-47.

   ***Category 4: Denial of Premium Pay for Schedule Changes.***  Kim

also alleges that she was improperly denied benefits when her start times changed

due to her transfer into PL 373, the Manual Distribution Division.  In addition to

being available for certain days and time slots, premium pay is awarded to

employees whose work schedules were changed by USPS management.  In

February and April of 2003, Kim requested premium pay stemming from her

transfer from PL 341 to PL 373.  Kim based her request on the fact that under the

terms of her transfer, her start time had changed from 3:00 p.m. to 6:30 p.m.

Kokobun denied Kim's request for extra pay, basing his decision upon his

understanding of the March 2003 agreement between the USPS and the union

relating to Kim's overtime work schedule.  Kokobun's Decl. ¶ 11.  Kim filed two

grievances relating to Kokobun's decision, both of which were denied.  Kim did

not appeal the denials.

12

***Category 5: Denial of a Push-Button Garage Gate Opener.***  Finally, Kim claims that the USPS failed to reasonably accommodate her disability when it refused to provide her with an automatic push-button garage opener for the employee parking lot.  Kim apparently requested an automatic push-button opener on two separate occasions, first on December 26, 2001 and then again on March 27, 2003.  Like other USPS Honolulu Processing and Distribution Center employees, Kim had previously been provided with a key card that opened the employee parking lot gate when waved in front of a scanner.  However, Kim claimed that leaning out of her car window to use her key card hurt her neck and thus wanted an automatic push-button garage gate opener.  Automatic push-button garage gate openers -- as opposed to the key cards -- were provided only to the drivers of large trucks who were not able to reach the scanner.

Following Kim's December 26, 2001 request, Kokobun attempted to obtain a push-button opener for Kim but was unable to do so.  Kokobun's Decl. ¶ 7.  As a substitute measure, Kim was informed in February of 2002 that she could park in the customer parking lot so that she would not have to use the gated parking lot.  *Id.*; Pl's. Ex. B at 1.  Kim declined to do so since it would require her to walk twice as far, which she worried might cause further injury to her back.  Pl's. Ex. C at 3-5.  Moreover, since Kim's weekend shift ended as late as 11:30

13

p.m., she felt unsafe walking to her car in a deserted customer parking lot. *Id.* at 4-5.  USPS Senior Manager Glenn Sakagawa agreed that parking in the customer parking lot was not a viable solution for Kim and thus suggested that she resume parking in the employee's parking lot where a limited duty employee would be posted at the gate entrance and would let Kim pass without requiring her to swipe her card.[6]  Pl's. Ex. D at 1.

The record does not reflect whether or when this solution was implemented and, if so, why it was unsatisfactory for Kim.  Instead, the record reflects only that Kim submitted an additional request for an automatic push-button garage gate opener in March of 2003.  As part of her request, Kim submitted a "work restriction profile" dated March 27, 2003 from the St. Francis Medical Center which recommended an "auto gate opener."  Pl's. Ex. A at 1.  The record does not reflect what, if any, efforts the USPS made to accommodate or respond to this request.

///

///

_____

[6]  The letter from Sakagawa was dated February 12, 2002.  The limited duty employee was to be posted at the employee gate entrance starting March 2, 2002.  As a way to minimize Kim's strain during the two week interim, Sakagawa suggested that Kim step out of her car to swipe her card or offered to allow her to start at a time when a different limited duty employee would be available to let her in.

**B.**            **Procedural Background**

Kim filed her Complaint on May 18, 2005 and the Defendant

answered on August 1, 2005.[7]  The Defendant filed a Motion to Dismiss and for

Partial Summary Judgment on August 9, 2006.  Kim filed her Opposition on

October 12, 2006 and the Defendant filed a Reply on October 19, 2006.  The court

heard oral arguments on October 30, 2006.

### III.  STANDARDS OF REVIEW

**A.**            **Standard of Review for Fed. R. Civ. P. 12(b)(1) Motions**

Under Federal Rule of Civil Procedure 12(b)(1), a court will dismiss

claims over which it lacks proper subject matter jurisdiction.  When considering a

motion to dismiss for lack of proper subject matter jurisdiction, the court may

review supplemental materials necessary to resolve jurisdictional fact issues.  *See*

*Ass'n of Am. Med. Colls. v. United States*, 217 F.3d 770, 778 (9th Cir. 2000).

However, where the jurisdictional question is intertwined with the merits of the

case, the court will treat the motion to dismiss for lack of subject matter

jurisdiction under Rule 12(b)(1) as a motion for summary judgment under Rule 56.

---

[7]  Kim filed her Complaint against the USPS jointly with Plaintiff Ernest Ho.  The USPS also moved for summary judgment as to Ho's claims, a motion which the court granted on April 26, 2006.  *See Kim & Ho v. Potter*, 460 F.Supp.2d 1194 (D. Haw. 2006) (hereinafter "Ho").

*See Augustine v. United States*, 704 F.2d 1074, 1077 (9th Cir. 1983) ("[W]here the jurisdictional issue and substantive issues are so intertwined that the question of jurisdiction is dependent on the resolution of factual issues going to the merits, the jurisdictional determination should await a determination of the relevant facts on either a motion going to the merits or at trial."). The moving party "should prevail [on a motion to dismiss] only if the material jurisdictional facts are not in dispute and the moving party is entitled to prevail as a matter of law." *Casumpang v. Int'l Longshoremen's & Warehousemen's Union*, 269 F.3d 1042, 1060-61 (9th Cir. 2001).

**B.      Standard of Review for Fed. R. Civ. P. 56 Motions**

A party is entitled to summary judgment as to any claim where there is no genuine issue as to any material fact contained in the pleadings, depositions, answers to interrogatories, admissions or affidavits. Fed. R. Civ. P. 56(c). "One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). When reviewing a motion for summary judgment, the court construes the evidence -- and any dispute regarding the existence of facts -- in favor of the party opposing the motion. *Snead v. Metro. Prop. & Casualty Ins. Co.*, 237 F.3d 1080, 1086 (9th Cir. 2001). The moving party bears the initial

16

burden of showing that there is no factual dispute regarding those claims for which summary judgment is sought. *See T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n.*, 809 F.2d 626, 630 (9th Cir. 1987). Nevertheless, "summary judgment is mandated if the non-moving party 'fails to make a showing sufficient to establish the existence of an element essential to that party's case.'" *Broussard v. Univ. of Cal. at Berkeley*, 192 F.3d 1252, 1258 (9th Cir. 1999) (*quoting Celotex*, 477 U.S. at 322).

## IV.   <u>ANALYSIS</u>

**A.        Claims Regarding Events Prior to August 26, 2002 Are Untimely and Are Dismissed**

In order to bring a claim under the Rehabilitation Act, a plaintiff must first exhaust her administrative remedies.[8]  Under 29 C.F.R. § 1614.105(a), "aggrieved persons who believe they have been discriminated against on the basis of . . . handicap must consult [an EEOC] Counselor prior to filing a complaint in

---

[8]  Section 501 of the Rehabilitation Act, as originally enacted, required federal agencies to adopt affirmative action employment plans for the disabled.  In its original form, Section 501 did not contain a private right of action.  In 1978, Congress added a private right of action by adopting Section 505(a)(1), codified at 29 U.S.C. § 794(a)(1), which provided that the rights and remedies of Title VII claims are available to plaintiffs claiming discrimination on account of their disabilities.  The incorporation of the rights and remedies of Title VII brought with it a corresponding requirement that the federal employee plaintiff exhaust her administrative remedies prior to proceeding.  This exhaustion requirement applies equally to Section 504 claims as codified at 29 U.S.C. § 794.  *See Boyd v. United States Postal Service*, 752 F.2d 410, 412-14 (9th Cir. 1985).

order to try to informally resolve the matter."  This consultation must occur within 45 days of the perceived violation of the plaintiff's rights.  29 C.F.R. § 1614.105(a)(1).  "The time period for filing a complaint of discrimination begins to run when the facts that would support a charge of discrimination would have been apparent to a similarly situated person with a reasonably prudent regard for his rights."  *Boyd*, 752 F.2d at 414.  If the plaintiff employee fails to timely file her complaint within the applicable 45-day period, her discrimination claims are time-barred and will be dismissed.  *See Lyons v. England*, 307 F.3d 1092, 1105 (9th Cir. 2002).

Here, the record reflects that the Plaintiff Kim contacted an EEO counselor on October 10, 2002.  Kim has not claimed -- and nothing in the record supports -- the application of the principles of estoppel or equitable tolling.  Thus, the only claims that are before the court are those violations (or portions of the violations) occurring on or after August 26, 2002.  Those claims -- or portions thereof -- that occurred on or prior to August 25, 2002 are dismissed as time-barred.[9]

---

[9] Citing *Brooks v. San Mateo*, 229 F.3d 917, 929-30 (9th Cir. 2000), the USPS argues that "an action which the employee succeeds in overturning through a union grievance, or which the employee does not pursue through an available grievance process, is not an adverse personnel action." Def's. Reply Mem. 10-11; *see also* Def's. Mot. to Dismiss and for Partial Summ. J. 16 The government reads *Brooks* too broadly.  In *Fonseca v. Sysco Food Services of Arizona,* 374

(continued...)

**B.**       **The Court Grants in Part and Denies in Part USPS's Motion for Partial Summary Judgment as to Kim's Discrimination Claims**

The Rehabilitation Act, 29 U.S.C. § 791 *et seq.*, prohibits the USPS from discriminating against employees on the basis of their disability.  Section 794(a) provides that "[n]o otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination . . . under any program or activity conducted . . . by the United States Postal Service." 29 U.S.C.  § 794(a).

The familiar burden-shifting scheme set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) applies to claims of discrimination on account of a disability.  *See Raytheon Co. v. Hernandez*, 540 U.S. 44 (2003) (applying

---

[9](...continued)

F.3d 840 (9th Cir. 2004), the Ninth Circuit limited the holding of *Brooks* and distinguished it from fact patterns similar to the one presently at bar.  First, *Brooks* dealt with a scenario where "a successful grievance could change the nature of an employment action . . . ."  *Fonseca* 374 F.3d at 848.  Here, however, Kim was denied the opportunity to work on holidays or in premium pay periods.  She sustained the harm upon the passing of those opportunities and, unlike the facts in *Brooks*, grievances filed after the fact could not avoid the harm.  Second, *Brooks* dealt with a single complaint while *Fonseca* addresses a scenario, like the present, where a plaintiff employee has filed several successful grievances for some, but not all, of the allegedly improper acts.  *Id.* Where a disabled employee has to jump through hoops to receive her rightful opportunities and compensation, but non-disabled employees do not, a discrimination cause of action will not be defeated simply because the disabled employee has exerted time and effort to vindicate her rights through a union grievance process.  Nor should a discrimination claim necessarily be defeated simply because the targeted employee, out of exhaustion or futility, chooses not to file a union grievance.

*McDonnell Douglas* burden shifting framework to ADA disability discrimination claim).  Under this burden-shifting scheme, Kim must first set forth a prima facie disability discrimination claim under the Rehabilitation Act.  Once Kim has put forth her prima facie claim, the burden then shifts to the USPS, which must forward a legitimate, nondiscriminatory reason for its actions.  *See Smith v. Barton*, 914 F.2d 1330, 1340 (9th Cir. 1990); *Lucero v. Hart*, 915 F.2d 1367, 1371 (9th Cir. 1990).  If the USPS does so, the burden shifts back to Kim who must demonstrate that the USPS's proffered reason is pretextual or "encompassed unjustified consideration" of Kim's disability.  *Smith,* 914 F.2d at 1340.

### 1.    *Kim Has Set Forth a Prima Facie Claim of Discrimination Due to Her Disability*

To put forth a prima facie disability discrimination claim, Kim must show that (1) she is disabled, (2) she is otherwise qualified (with or without reasonable accommodation) to perform the essential functions of her job, and (3) she was discriminated against solely due to her disability.  *See Mustafa v. Clark County Sch. Dist.*, 157 F.3d 1169, 1174 (9th Cir. 1998); *Lucero*, 915 F.2d at 1371. Kim has made the requisite showings.

///

///

> a.   *Kim has raised a triable issue that she is disabled*

To fall within the protections of the Rehabilitation Act, the Plaintiff first bears the burden of showing that her ailments constitute a disability under the law. *Thornton v. McClatchy Newspapers, Inc.*, 261 F.3d 789, 794 (9th Cir. 2001). The Rehabilitation Act incorporates the provisions of the Americans with Disabilities Act ("ADA"), including its definition of disabilities.[10]  29 U.S.C. § 791(g).  The ADA defines a disability as "a physical or mental impairment that substantially limits one or more of the major life activities."[11]  42 U.S.C. § 12102(2)(A).  Thus, the court is required to engage in a fact-intensive, case-specific subjective analysis (looking at the Plaintiff's condition) with an objective component (comparing that condition to a baseline of those acts that a non-disabled person would be able to perform).  The standard for qualifying as disabled under the Rehabilitation Act is a demanding one and the statutory terms are strictly construed.  *Toyota Motor Mfg., Kentucky, Inc. v. Williams*, 534 U.S. 184, 197

---

[10]  Title II of the ADA, codified at 42 U.S.C. § 12132, and section 504 of the Rehabilitation Act, codified at 29 U.S.C. § 794, incorporate the same rights, obligations, and standards.  *See* 29 U.S.C. § 794(d); 29 C.F.R. § 1614.203(b); *McLean v. Runyon*, 222 F.3d 1150, 1153 (9th Cir. 2000); *Newland v. Dalton*, 81 F.3d 904, 906 (9th Cir. 1996).

[11]  The other tests for legal disability under  42 U.S.C. § 12102(2), include having "a record of such impairment" or "being regarded as having such an impairment," do not apply to the facts at hand.  First, while the Plaintiff alleges a variety of medical conditions, she does not submit to this court any treatment files or medical data to substantiate the conditions or their long term treatment.  Nor does the Plaintiff submit evidence that third parties perceived or regarded her as disabled.

(2002).  Nonetheless, the court finds that Kim has offered evidence sufficient to show a triable issue as to her disability under the law.

### i.   Physical or mental impairment

In the present case, Plaintiff Kim has offered evidence showing that she suffers a physical ailment, including injuries to her cervical neck area (affecting her neck, shoulders, and upper back); the lumbosacral area of her lower back; and her respiratory system.  These injuries cause Kim to be in constant chronic pain and to suffer numbness in both hands and other parts of her body.

### ii.   Substantially limits

"[M]erely having an impairment does not make one disabled" under the Rehabilitation Act.  *Toyota*, 534 U.S. at 195.  Instead, to qualify for the protections of the Rehabilitation Act, a plaintiff must demonstrate that her impairments substantially limit a major life activity.  *Id.*  The word "substantial" means "'considerable' or 'to a large degree'" and therefore "clearly precludes impairments that interfere in only a minor way . . . from qualifying as disabilities." *Id.* at 197.  To be substantially limited, the plaintiff must be "significantly restricted as to condition, manner or duration under which [she] can perform a particular major life activity as compared to the condition, manner or duration under which

the average person in the general population can perform that same major life activity." 29 C.F.R. § 1630.2(j); *Toyota*, 534 U.S. at 195.

Kim has shown that her physical impairments operate as significant restrictions on the condition, manner, and duration under which she can perform particular activities as compared to an average, non-disabled peer. Kim claims to be limited in lifting, carrying, standing, sitting, walking, pushing, pulling, bending, stooping, climbing, turning, and overhead motions. For example, the record includes evidence that Kim can only stand for one minute before pain starts and can only walk at a slow pace for a maximum of thirty minutes (lest she further injure herself or incite an asthma attack requiring medication), and that she often requires the use of a stability aid for assistance. Moreover, Kim alleges that she can only walk up and down stairs through use of a railing and may only bend, crouch, or kneel with the use of furniture to steady and support her. As well, Kim apparently can only sit for limited periods of time, is unable to grip an object with both hands, has to avoid turning or twisting so as to prevent pain and further back injuries, and requires frequent rest breaks. If Kim ignores her physical restrictions, she claims that her condition worsens. For example, she argues that if she sits or stands for too long, she experiences numbness in her thighs and pain in her knees; and if she squats or kneels for too long, she has difficulty getting back up. All of these

23

restrictions are "substantial" limitations on the Plaintiff which are not experienced by non-disabled persons.

    iii. One or more of the major life activities

    Kim must raise a genuine issue of material fact as to whether her impairments substantially affect a major life activity. *See Thorton*, 292 F.3d at 1046. The word "'major' in the phrase 'major life activities' means important." *Toyota*, 534 U.S. at 197. In short, Kim must thus show that she suffers "an impairment that prevents or severely restricts . . . activities that are of central importance to most people's daily lives." *Id.* at 198. Examples of some such activities include bathing, brushing one's teeth, doing household chores, caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, reading, breathing, driving, learning, using tools, working, playing sports, and the like. *See* 29 C.F.R. § 1630.2(i); *Toyota*, 534 U.S. at 201-02; *Fraser v. Goodale*, 342 F.3d 1032, 1038 (9th Cir. 2003); *see also EEOC v. United Parcel Serv., Inc.*, 306 F.3d 794, 803 (9th Cir. 2002).

    In the case at hand, Kim has introduced evidence stating that her injuries substantially affect her ability to sleep, brush her hair and teeth, shower, use the restroom, cook, eat, do laundry, and shop. Kim has therefore shown that her disability substantially limits major life activities. Given the foregoing, Kim

has alleged facts sufficient to make a prima facie showing that she is legally disabled and thus part of the protected group of persons eligible to claim relief under the Rehabilitation Act.

### b. Kim is otherwise qualified to work for the USPS

The statutory language of 29 U.S.C. § 706(8)(b) only protects "qualified handicapped individuals" from discrimination. The question of whether Kim is otherwise qualified for her position is reserved for the courts. Here, the court finds that Kim is able, with some limited accommodations, to perform various jobs in the employ of the United States Postal Service.

### c. Kim has offered evidence of adverse personnel actions suffered on account of her disability

The Rehabilitation Act incorporates the substantive standards of Title I of the ADA as to the definition of "discriminate." 42 U.S.C. § 12112(b)(1). Under the ADA, the Plaintiff must demonstrate that she suffered adverse personnel actions which materially affect the terms, conditions, or privileges of her employment. 42 U.S.C. § 2000e-2(a)(1). In short, "only non-trivial employment actions" will constitute an adverse action. *Brooks*, 229 F.3d at 928. The court considers whether Kim's claims, as outlined in the five general categories,

constitute an adverse employment action for the purpose of a disability discrimination claim.

i.   Category 1: Administrative and procedural problems

Kim alleges a variety of administrative and procedural problems as the first general category of her discrimination claims. These errors, while certainly aggravating, do not constitute an adverse employment action materially affecting the terms, conditions, or privileges of Kim's employment. Paperwork errors which led to improper pay deductions were corrected (even if not in a timely fashion). As for the other administrative errors, the court acknowledges that postal supervisors ought not to delete or misplace forms or incorrectly complete standard paperwork. Nonetheless, these are errors common to a large government bureaucracy and Kim has not shown that what she experienced was either unusual or proximately linked to her disability.

Thus, the court finds that the administrative and procedural problems as set forth on the record do not combine to constitute adverse personnel actions under the law. The court therefore GRANTS the Defendant's motion for summary judgment as to these claims.

      ii.    Categories 2-4: Denial of holiday work; lost premium pay due to out of schedule assignments; and denial of premium pay for schedule changes

Denial of holiday overtime work, out-of-schedule assignments, and denial of premium pay due to a change in schedule all result in a loss of otherwise-expected compensation and thus affect the terms, conditions, and privileges of Kim's employment.  This tangible loss of benefits clearly constitutes an adverse personnel action.  *See Fonseca*, 374 F.3d at 847.  For the purpose of setting forth a prima facie claim, Kim has proffered a proximate link between her disability and these acts.

      iii.    Category 5: Denial of a push-button garage gate opener

The denial of a push-button garage gate opener does not affect the terms, conditions, or privileges of Kim's employment and thus is not an adverse personnel action for the purposes of making a disability discrimination claim.  The court will more directly address the issue of the automatic push-button garage gate opener when discussing Kim's accommodation claim *infra*.

### 2.    *The USPS Has Offered a Legitimate, Nondiscriminatory Reason for the Actions Taken*

The USPS forwards different reasons for denying Kim's holiday overtime work and premium pay, including not having work available for Kim

within her medical restrictions; union regulations which prohibited permitting Kim

to sign up for overtime outside of her pay location; Kokobun's understanding of

the terms of a settlement agreement; and administrative errors.

### 3.   *Kim Has Presented Sufficient Evidence that the USPS's Proffered Reasons Are Pretextual*

In order to withstand summary judgment, Kim must raise a genuine

issue of material facts showing that USPS's proffered reasons for its actions were

pretextual.  "Unless [Kim] can show that [the USPS's] explanation . . . was a

pretext for disability discrimination [Kim] . . . has presented no triable issue . . . ."

*Collings v. Longview Fibre Co.*, 63 F.3d 828, 833 (9th Cir. 1995) (discussing claim

under the ADA).  Kim can make the required showing using either direct evidence

that the USPS discriminated against her on account of her disability or

circumstantial evidence tending to show that the USPS's proffered reasons for its

actions is unworthy of credence.  The court finds that Kim has raised sufficient

evidence to make the required showing under either the traditional summary

judgment standard or the more stringent "specific and substantial" standard.[12]  *See*

---

[12]  Kim's Memorandum in Opposition does not directly address the evidence of pretext. At oral argument, Kim's counsel asked the court to infer pretext from the same evidence that supports Kim's prima facie case.

*generally Ho*, 460 F.Supp.2d. 1194 (discussing applicable standard for pretext in Rehabilitation Act discrimination claims).

Kim's strongest evidence of pretext is that the USPS continually denied her holiday work and assigned her out of schedule -- even after agreements and settlements had been reached which granted Kim the right to this work.  In March 2003, the USPS and the union reached an agreement that would have allowed Kim to work overtime outside of her assigned permanent pay location (PL 389).  Nonetheless, Kim was still passed over for certain holiday hours and filed six union grievances between May and November 2003, all of which the USPS agreed to settle.  Kim also filed a Department of Labor claim regarding lost premium pay.  Only a day later, Kokobun and Tomooka assigned Kim out of schedule, causing her to lose additional hours compensated at the premium pay rate.  This claim was settled on June 21, 2002, and the very next day Tomooka once again assigned Kim out of schedule.  Kokobun did the same thing in August 2002.  Indeed, Kim alleges that she was continuously placed out of schedule -- the precise wrong her settlement agreement had been designed to address -- from June 2002 to December 2005.  At best, denying Kim holiday work and assigning her out of schedule against a just-finalized settlement agreement demonstrates an utter lack of organization and poor administration.  At worst, when viewing this evidence in the

29

light most favorable to Kim, these actions evince a hostility on the part of Kokobun and Tomooka towards Kim.  This hostility calls into question the USPS's explanation of events.  Thus, the court finds that Kim has offered circumstantial evidence tending to show that USPS's proffered non-discriminatory explanation is unworthy of credence.

**C.      The USPS Is Entitled to Summary Judgment as to Kim's Accommodation Claim**

Kim alleges that the USPS failed to reasonably accommodate her disability when it refused to issue her an automatic push-button garage gate opener instead of the standard-issue key card garage opener.  The Rehabilitation Act requires federal agencies, including the USPS, to "reasonably accommodate an employee's disability."  *McLean*, 222 F.3d at 1153.  Reasonable accommodation claims are governed by the explicit terms of the Rehabilitation Act and its enacting regulations.  Section 504 of the Rehabilitation Act, codified at 28 C.F.R. § 35.130(b)(7) provides that,

> a public entity shall make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity.

In short, the USPS has an affirmative duty to provide "reasonable accommodations to the known physical or mental limitations of their employees."  42 U.S.C. § 12112(b)(5)(A); *see also Vinson v. Thomas*, 288 F.3d 1145, 1154 (9th Cir. 2002).

When analyzing whether a federal agency has reasonably accommodated the disabilities of its employees, the court first considers whether the employee is a person with a disability as defined by the Rehabilitation Act. *Coons v. Sec'y of the United States Dep't of the Treasury*, 383 F.3d 879, 884 (9th Cir. 2004).  The court finds, for the reasons previously stated, that Kim has raised a genuine issue that she is disabled.  Even so, the USPS is not required to award Kim the exact accommodation she seeks; instead the USPS need only provide Kim with some reasonable accommodation.  *See Zivkovic v. S. Cal. Edison Co.*, 302 F.3d 1080, 1089 (9th Cir. 2002) ("An employer is not obligated to provide an employee the accommodation he requests or prefers, the employer need only provide some reasonable accommodation.").

Kim bears the initial burden of producing evidence that a reasonable accommodation was possible.  *Wong v. Regents of the Univ. of Cal.*, 192 F.3d 807, 816-17 (9th Cir. 1999).  To meet this burden, Kim "must only provide evidence sufficient to make at least a facial showing that reasonable accommodation is

31

possible." *Buckingham v. United States*, 998 F.2d 735, 739-40 (9th Cir. 1993)

(citations omitted).  If Kim does so, the burden shifts to the USPS to produce

rebuttal evidence that the requested accommodation was not possible, was

unreasonable, or would be an undue burden.  *See Vinson*, 288 F.3d at 1154; *Wong*,

192 F.3d at 817; *see also Arneson v. Heckler*, 879 F.2d 393, 396 (8th Cir. 1989).

The court thus undertakes "a fact-specific, individualized analysis of

the disabled individual's circumstances and the accommodations that might allow

[her] to meet [the job's] standards." *Wong*, 192 F.3d at 818.  Kim alleges that the

USPS failed to accommodate her when it refused to issue her an automatic gate

opener.[13]  Kim requested an automatic push-button garage gate opener on

December 26, 2001 and March 27, 2003.  Following Kim's December 2001

request, the USPS determined that it did not have an automatic push-button garage

gate opener available for Kim.  Instead, the USPS offered Kim a number of

---

[13]  Kim's Opposition and Declaration also contain language referencing USPS's failure to assign her to a permanent bid position in PL 373 as a failure to accommodate her disability.  The court notes that both Title I of the ADA and the regulations implementing the Rehabilitation Act provide that reasonable accommodations include, in certain circumstances, a duty to reassign a disabled employee to a vacant position which falls within her limitations.  *See* 42 U.S.C. § 12111(9)(B); 29 C.F.R. § 1614.203(g); *McLean*, 222 F.3d at 1153-54.  However, this accommodation claim is not included in Kim's First Amended Complaint.  Nor has Kim moved to again amend her Complaint.  Instead, the first time that this accommodation claim is clearly enunciated is in Kim's Opposition and Declaration filed in response to the USPS's Motion to Dismiss and for Partial Summary Judgment.  Pl.'s Mem. in Opp'n to Def's Mot. to Dismiss and for Partial Summ. J. 31.  It would clearly prejudice the USPS to permit Kim to include this claim by way of her Opposition.  The court thus does not address this claim at this time.

alternative accommodations.  As best as can be ascertained from the record, the USPS posted a limited duty employee at the garage entrance who would let Kim pass into the parking lot without requiring her to swipe her key card.  Kim has not offered any evidence showing that this accommodation was no longer in place or no longer sufficient in 2003.  Instead, the record only reflects that Kim again requested an automatic push-button garage gate opener on March 27, 2003.  As part of her request, Kim submitted work restriction paperwork recommending "an auto gate opener," but not specifying a push-button, as opposed to scanning, feature.  The record does not reflect what, if any, steps the USPS took to accommodate this 2003 request.

The court finds that Kim has not produced documentation sufficient to support her assertion that the key card gate opener was insufficient.  The 2001 request and corresponding accommodation claim is time-barred.  With regards to the 2003 request, Kim has not provided sufficient evidence to show that the previously established accommodation -- posting a guard at the garage to let her in without swiping -- was insufficient and that a push-button automatic garage opener was medically necessary.  Kim did include a work restriction profile as part of her request, but this documentation only recommends "an auto gate opener."  There is no other information included in the available record which would shed

light as to the specific meaning of this recommendation.  Given this, the court

cannot conclude that "an auto gate opener" necessarily refers to a push-button gate

opener or anything other than the automatic key card opener which Kim already

possessed.  The court therefore finds that Kim has not alleged a triable issue of a

failure to accommodate her disability.

**D.        The Defendant Is Entitled to Summary Judgment on the Hostile
           Work Environment Claims**

It is unclear to the court whether Kim's allegations of harassment[14]

are meant to constitute a hostile work environment claim.  To the extent that they

are intended to so forward, the claims fail.  The court finds that there is no triable

issue as to whether the USPS's conduct was sufficiently severe, frequent, or

abusive to interfere with Kim's employment or was so unreasonable that it would

force an employee in Kim's position to quit.  *See Porter v. Cal. Dep't of Corr.*,

419 F.3d 885, 893 (9th Cir. 2005); *Kortan v. Cal. Youth Auth.*, 217 F.3d 1104,

1110-11 (9th Cir. 2000).

\\\

\\\

---

[14]   Kim includes a general claim of harassment as part of her cause of action.
Specifically, Kim's First Amended Complaint reads, "Kim has been subjected to ongoing
harassment regarding the mishandling of her May 9, 2003 annual leave request."  First Am.
Compl. ¶ 21.

# V.  <u>CONCLUSION</u>

For the foregoing reasons, the court GRANTS IN PART AND DENIES IN PART the Defendant's Motion to Dismiss and for Partial Summary Judgment.  The court GRANTS the Defendant's Motion to Dismiss for time-barred claims and also GRANTS the Defendant's Motion for Partial Summary Judgment as to the Plaintiff's discrimination claims arising from administrative errors and failure to provide an automatic push-button garage gate opener; the Plaintiff's accommodation claim; and the Plaintiff's hostile work environment claims.  The court DENIES the Defendant's Motion for Partial Summary Judgment as to the Plaintiff's discrimination claims relating to lost holiday work and premium pay.

In light of the court's ruling, the following claims remain: (1) the claims as set forth in paragraph 25 of Kim's Complaint; and (2) the discrimination claims relating to the denial of holiday work, lost premium pay due to

\\\

\\\

\\\

\\\

out-of-schedule assignments, and denial of premium pay due to schedule changes.

IT IS SO ORDERED.

DATED:  Honolulu, Hawaii, January 26, 2007.



_/s/ J. Michael Seabright_
J. Michael Seabright
United States District Judge

_Kim, et al. v. Potter_, Civ. No. 05-00332 JMS/LEK, Order Granting in Part and Denying in Part Defendant's Motion to Dismiss and for Partial Summary Judgment