IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| JOHANNA KIM, | ) | CIVIL NO.  05-00332 JMS/LEK |
| | ) | |
| Plaintiff, | ) | ORDER GRANTING IN PART AND |
| | ) | DENYING IN PART DEFENDANT'S |
| vs. | ) | MOTION FOR PARTIAL |
| | ) | DISMISSAL AND PARTIAL |
| JAMES E. POTTER, in his capacity as | ) | SUMMARY JUDGMENT |
| the Postmaster General, United States | ) | |
| Postal Service, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

## ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR PARTIAL DISMISSAL AND PARTIAL SUMMARY JUDGMENT

## I.  INTRODUCTION

On May 2, 2007, Plaintiff Johanna Kim ("Plaintiff") filed her Second

Amended Complaint against Postmaster General John Potter, in his official

capacity ("Defendant"), alleging that the United States Postal Service ("USPS")

unlawfully discriminated and retaliated against her due to her disabilities, and

failed to reasonably accommodate her disabilities in violation of the Rehabilitation

Act, 29 U.S.C. § 791, *et seq*.  Defendant moves for partial dismissal and partial

summary judgment on six claims not raised in Plaintiff's earlier complaints.

Defendant also asks the court to renew its rulings on most of the matters

previously ruled upon.[1]  For the following reasons, the court GRANTS in part and

DENIES in part the Defendant's Motion for Partial Dismissal and for Partial

Summary Judgment.

## II.  <u>BACKGROUND</u>

**A.     Factual Background**

Plaintiff began working for the USPS Honolulu Processing and

Distribution Center ("HPDC") in 1986 as a Mail Processing Clerk with a bid

position in Pay Location ("PL") 341, the Mechanized Flat Distribution Division.

The USPS establishes a set number of bid positions necessary to accomplish the

sorting and delivery of mail by periodically evaluating the HPDC facility's needs

and resources.  Kokubun Decl. ¶ 2.  Under the collective bargaining agreement

("CBA"), USPS employees may bid for vacant jobs, which are awarded to the

most senior qualified applicant.  Def.'s Ex. 1; Kokubun Decl. ¶ 3.

In 1998, Plaintiff was injured on the job and no longer able to

perform the duties of her bid position in PL 341.  Because of her injuries, the

USPS created a job for Plaintiff in PL 373, Manual Distribution, which involved

hand-sorting letters which could not be read by machine.  In July 2000, Plaintiff

_____

[1] The court previously granted in part and denied in part Defendant's Motion to Dismiss and for Partial Summary Judgment.  *See Kim v. Potter*, 474 F. Supp. 2d 1175 (D. Haw. 2007).

was again injured on the job and was classified as a "limited duty" employee.  Pl.'s Decl. ¶ 2.

As a result of Plaintiff's work-related injuries to her neck and back, as well as her asthma, she had the following work restrictions as of 2004:

- Can lift up to 20 pounds;
- No prolonged sitting, standing, walking, or kneeling;
- No repetitive bending, squatting, or stair climbing;
- No repetitive or prolonged hand movements;
- No twisting;
- No reaching or working above her shoulders;
- No exposure to dust, fumes, or gases;
- Frequent rest breaks required when performing repetitive activities.

Pl.'s Exs. B & C.

"Limited duty" employees are not able to perform all the functions of their original positions due to on-the-job injuries, while "light duty" employees suffer impairments received from non-work related injuries.  Pl.'s Decl. ¶ 2. Temporary "limited duty" jobs are created as part of a program to allow employees with on-the-job injuries to continue working, even though they are not able to perform their previous bid position duties, rather than paying them benefits under the Federal Employees Compensation Act ("FECA") without them doing any work.  Kokobun Decl. ¶ 7.  Unlike bid positions, there is no set number of limited duty jobs; instead, they are created as needed for eligible employees.  *Id.*  Each job

3

expires when the incumbent vacates it; thus, when Plaintiff began working in PL 373 doing manual distribution work, she did not replace another employee or fill a vacant position.  *Id.*

Plaintiff worked temporary limited duty in PL 373 Manual Distribution from 1998 through December 2005.  The USPS could not permanently assign Plaintiff to a bid position in Manual Distribution because, under the CBA, it would first have to post the vacant position for bid and award it to the most senior qualified candidate.  Kokobun Decl. ¶ 8.[2]  Manual distribution involves sorting mail into cases, described as "pigeon holes."  Pl.'s Decl. ¶ 67. When the cases are filled, the bundles of mail are removed and placed into trays for dispatch.  *Id.*  The mail distribution shelves for letters consist of two metal shelves: one fronting the postal worker that is seven columns wide by seven rows high and another "wing" case to the right that is four columns wide by seven rows high.  Pl.'s Decl. ¶ 68.  The highest rows are above Plaintiff's shoulder level.  *Id.* All of the employees in bid positions in PL 373 (other than Plaintiff, who did not hold a bid position) were capable of distributing "flats," which are larger pieces of mail, such as magazines or legal size envelopes.

_____

[2] Plaintiff's supervisor in Manual Distribution was Milton Kokubun ("Kokubun"), Manager of Distribution Operations for Tour 3 (the swing shift).

According to Plaintiff, she was able to perform the essential functions of Manual Distribution, but with modifications for accommodation.  Pl.'s Decl. ¶ 3.  She claims that she avoided gripping objects using a "pencil grip," and used her "thumb with full flat pressure to grasp mail," which allowed her to sort mail within her limitations.  Pl.'s Decl. ¶ 73.

In May 2002, the USPS reorganized a portion of mail distribution operations so that employees who performed manual distribution in pay locations other than PL 373 were sent to work in the stations outside HPDC.  Kokobun Decl. ¶ 9.  The USPS then posted openings for approximately 20 bid positions in PL 373, Manual Distribution.  *Id.*  Plaintiff did not bid for these positions.  Starting in 2004, Milton Kokubun made efforts to move Plaintiff out of Manual Distribution and into another job.  According to Kokubun, the reasons for wanting to move Plaintiff were:

> a.      increasing automation substantially reduced the volume of mail to be manually distributed.  From fiscal year 2006 to fiscal year 2007, the decline in Manual Distribution letters at the HPDC was more than 4%, from 5,100,643 to 4,892,906 letters . . . . [F]our permanent light duty employees and five permanent limited duty employees retired, and the Postal Service did not create new bid positions to replace them.  More recently, in September 2007, five bid positions in PL 373 were abolished.
> b.      Unlike other employee[s] in Manual Distribution, Ms. Kim used only one hand to distribute mail, was unable to grip

5

with the thumb of the hand she did use, and required frequent rest breaks.  As a result she was at her case less than any other employee in PL 373.  Several supervisors over the years, including James Jones and Larry Kumata, complained to me that Ms. Kim was very slow.  I did not receive anywhere near the same volume of similar complaints about any other temporary PL 373 worker.

c.      She spent less time on the job, and more time on breaks, than any other employee working in PL 373.

Kokubun Decl. ¶ 10.

Plaintiff disputes Kokubun's explanation.  With respect to the downsizing of Manual Distribution, she claims that the work force in PL 373 actually increased because flats were sorted manually following the 2003 elimination of a machine, but that there still remained letter-class mail that she could have sorted.  Pl.'s Decl. ¶ 88.  She also claims that she had never been sent home because of a lack of work and that people were called in to work overtime because of the volume of work.  Pl.'s Decl. ¶¶ 86-87.  Plaintiff disputes Kokubun's statements regarding her job performance, and asserts instead that she was able to distribute mail with a modified grip; she is not aware of any productivity standards, only accuracy standards for employees; and she was never notified that her work was not accurate.  Pl.'s Decl. ¶¶ 73-77.  She also claims that other employees in Manual Distribution used only one hand or were accommodated in some manner.  Pl.'s Decl. ¶¶ 71-72.

6

In April 2004, Kokubun asked Plaintiff to try a job in the Times Web program,[3] a permanent limited duty position that USPS would create for her.  The job entailed recording information about incoming and outgoing truck departures at the HPDC on a clipboard and then inputting the data into a computer.  Kokubun Decl. ¶ 11.  Around May 2004, Plaintiff rejected the Times Web position on a permanent basis because she felt it was outside of her medical restrictions as the keyboarding caused pain to her hands.  Pl.'s Decl. ¶ 14; Kokubun Decl. ¶ 11.

### 1.   *December 2005 Job Assignment*

The USPS formally offered to transfer Plaintiff to the Times Web position in a job offer dated March 18, 2005.  *See* Pl.'s Ex. D.  Plaintiff was concerned about the physical location of the position and job duties.  Because the job was located outdoors in the East and West docks and because of her asthma-related work restrictions, Plaintiff was worried that she would be exposed to gasoline or exhaust fumes from the trucks and airplanes, and cigarette smoke from employees.  Pl.'s Decl. ¶¶ 11-13.  She was also worried about pain to her hands caused by keyboarding.  Pl.'s Decl. ¶ 14.

---

[3] Times Web is a computer program used to track incoming and outgoing trucks.  Pl.'s Decl. ¶ 14.

Plaintiff was given a letter with the job offer on March 22, 2005.  On April 5, 2005, she called Alan Ueno ("Ueno"), Injury Compensation Manager, and told him that she was concerned about the Times Web job offer because she had three worker's compensation incidents for gasoline fumes and dust.  Pl.'s Decl. ¶ 15.  Because the job offer did not indicate the date by which Plaintiff was to respond and because she did not receive any feedback about the exact requirements of the job by April 2, 2005 (the date she was supposed to report to the Times Web job), Plaintiff continued to work in PL 373.  Pl.'s Decl. ¶ 18.

Plaintiff formally refused the job on April 11, 2005 on the basis that it was not within her medical restrictions since she felt it would require prolonged and repetitive hand function and exposure to fumes and gases.  Pl.'s Decl. ¶ 19.  After she refused the Times Web position, Kokubun showed Plaintiff a list of six other possible jobs and asked her what she could do.  One of the jobs was "Times input" (the position she had just rejected) and Plaintiff believed the other five jobs also required repetitive motion that exceeded her limitations.  Pl.'s Decl. ¶ 20.  Plaintiff told Kokubun the only job she could do was manual distribution.  Pl.'s Ex. P.

During the Fall of 2005, the Department of Labor Office of Workers' Compensation Programs ("OWCP") determined that Plaintiff's stated reasons for

8

refusing to accept the Times Web position were not valid.[4]  Def.'s Ex. D.  A

November 10, 2005 letter from OWCP states:

> We have received notice that your refusal to accept, or report to, the job you were offered continues.  We notified you by letter dated 09/28/05 that we found the offered position suitable and that you had 30 days to accept the offered position or provide your reasons for your refusal.
>
> We have considered all reasons that you provided for refusing to accept the offered position, and do not find them to be valid. . . .
>
> We have verified with your employing agency that the Times Web program is available and is appropriate to your medical restrictions. . . .
>
> Also, your statement to refuse the "Permanent Rehabilitation Job Offer because [you are] not getting treatment" . . . or because it has caused or will cause you to be sick or injured, or aggravate an already existing injury is not considered a valid reason to refuse a suitable job offer. . . .
>
> This letter is notice of our finding that you have not provided a valid reason for refusing to accept the offered position.

Def.'s Ex. 2 (alteration in original).  The letter from OWCP advised Plaintiff that

unless she accepted the Times Web offer, she would lose certain OWCP benefits,

including "entitlement to wage loss and schedule award damages."  *Id.*  Plaintiff

accepted the position in December 2005.

---

[4] The record does not reflect the genesis of Plaintiff's dealings with OWCP regarding the Times Web position or her workers' compensation benefits.

On February 3, 2006, the EEO office received a Pre-Complaint Counseling form from Plaintiff, dated February 1, 2006.  Hashimoto Decl. ¶ 2; Def.'s Ex. 9.  The form states that Plaintiff had suffered "disability discrimination and retaliation" since December 3, 2005 when she was placed "in a faulty rehabilitation job."  Def.'s Ex. 9.  She alleged retaliation based on an "ongoing civil action 05-00332 DAE-LEK"[5] and sought reassignment to PL 373 Manual Distribution and compensation for overtime and holiday benefits that had been denied.  *Id.*

On December 5, 2005, Plaintiff went to the emergency room after working in the dock areas at HPDC.  Pl.'s Decl. ¶ 48.  On February 5, 2006, a large metal cage fell from its mechanized vehicle and crashed into the metal barrier fronting Plaintiff's work table.  Pl.'s Decl. ¶ 45.  She filed a union grievance on February 21, 2006, complaining that she was assigned to work in the East dock area, which was unsafe due to moving equipment and the accumulation of second-hand smoke.  *Id.*  On April 11, 2006, Kokubun signed a settlement regarding this union grievance, which permitted Plaintiff to move her work area:

> A review of the case files show that when other employees were interviewed they did not have the same unsafe feelings as Johanna Kim.  Both management and the union have agreed to

---

[5] This case was reassigned and is now Civil No. 05-00332 JMS/LEK.

> put Ms. Kim at ease by placing her in a different area inside the Plant under a different supervisor.  She will be allowed to do inputting in the air cargo office and assigned to Ms. Tammy Rogers.  Job offer will be given and the move to take place no later than April 29, 2006.

Pl.'s Ex. T.  According to Kokubun, during April 2006, Plaintiff continued to express concerns about her duties, so he helped to create a new permanent limited duty offer for her.  Kokubun Decl. ¶ 16.

### 2. *April 2006 Job Offer*

Plaintiff received a new permanent limited duty job offer on April 25, 2006, for a position titled "Rehab Mail Processing Clerk."  *See* Pl.'s Ex. E; Def.'s Ex. 3.  The position included the following five duties:

1. Collect and record data for our Times Web program. Record the arrival and departure times of our MVS and HCR trucks at the East and West Docks and enter the data into the computer.  You will also record the pieces of equipment/mail that each truck loads/unloads and enter that information in the Times Web program.  Data entry is done while seated at a computer terminal and lifting is limited to the clipboard that has the recording sheet.  You may sit or stand while recording the raw data.

2. AAA clerk: Sit at the mail transport belt and remove reject mail.  Ensure that correct classes of mail are being sorted.  Take D&R tags and labels off letter sleeves and flat lids.  These duties can be done while standing or sitting and you may alternate between the two, as needed.

11

3.     Quality control checks: Check labels on mail transport equipment to ensure mail in the equipment matches the destination on the label.

4.     Container counts for Times Web in the Air Cargo Unit: Count the number of airline containers that arrive and leave the unit.  Record the time that containers arrive and leave the unit.  Enter the information on a report and key it into the computer.  This can be done while seated or standing.

5.     Hang empty mail sacks in Operation PL 350 to prepare the work site for the priority mail operation.  This is done while standing.  Allowed to take breaks as needed.

If you are unable to perform these tasks for medical reasons, you must provide a medical report from your physician so management can adjust your job tasks accordingly.

Pl.'s Ex. E; Def.'s Ex. 3.  According to Kokubun, he did not offer to create a permanent limited duty position for Plaintiff in Manual Distribution for the same reasons he declined to do so in March 2005, and because Plaintiff could not distribute flats.  Kokubun Decl. ¶ 16.  He further claims: "Even if she had been able to distribute mail as fast [as] other PL 373 employees, I would not have created such an assignment, because I knew that the number of letters that would need to be manually distributed would continue to diminish in the coming months and years due to improving automation."  *Id.*

Plaintiff initially declined the job offer on April 25, 2006.  Pl.'s Ex. E; Def.'s Ex. 3.  After receiving written assurances through the union that her immediate supervisor, Tammy Rogers ("Rogers"), would work with her to make

12

adjustments as necessary, she agreed to accept the offer on April 30, 2006.

Kokubun Decl. ¶ 17; Pl.'s Ex. E; Def.'s Ex. 3.  Plaintiff claims that she was only

given four days to accept the job.  Pl.'s Decl. ¶ 32.

### 3.    *Interactive Process, Union Representation, and Break Recording*

Plaintiff claims that her physician was not consulted before the April

25, 2006 job offer was made and that there had not been an "interactive process"

between herself, her doctor, and management to ensure that the job offer would

account for her medical restrictions.  Pl.'s Decl. ¶ 39.  Because management did

not meet with her to provide detailed descriptions of the work, she claims she was

not able to give a copy to her doctor for him to comment or develop appropriate

restrictions.  Pl.'s Decl. ¶ 41.  Sometime after the April 25, 2006 job offer was

made, Ueno asked Plaintiff's physician, Dr. Scott McCaffrey, for "clear and

complete biomedical restrictions as they relate to Ms. Kim's condition."  Pl.'s Ex.

G.  Dr. McCaffrey responded in a June 5, 2006 letter suggesting a formal

functional capacity evaluation of Plaintiff.  *Id.*  Plaintiff claims that she "had been

scheduled for a medical examination on June 30, 2006, but it was cancelled when

the Injury Compensation office did not approve it.  My examination was re-

scheduled and conducted on August 16, 2006."  Pl.'s Decl. ¶ 80.

13

Plaintiff also claims that she was denied proper union representation during the time she received the April 25, 2006 job offer.  She claims that she asked Wes Teranishi, Supervisor of PL 389, for a shop steward on April 25, 2006, and was told that "the supervisor cannot let the shop steward, Wilfred Morales, out of the unit," Def.'s Ex. 10 at 96, but was later told that she had an appointment with steward Morales on April 28, 2006.  Pl.'s Decl. ¶ 34.  When Plaintiff arrived at work on April 28, 2006, Morales was not there.  Pl.'s Decl. ¶ 35.  The next day, April 29, 2006, Plaintiff was supposed to begin in the new position, but instead, clocked in at her old location and inquired about her meeting with Morales.  Pl.'s Decl. ¶ 36.  She was told by another employee that Morales "had been on annual leave."  *Id.*  According to Plaintiff, "[w]hen I finally did talk to Morales on Sunday, April 30, 2006, I learned that I was going to be removed for insubordination because I refused to sign the job offer.  I felt that I had no choice but to sign the job offer since my steward told me that if I signed the paper, management would take no further action."  Pl.'s Decl. ¶ 37.

Plaintiff claims that in May and June 2006, Rogers began to require her to keep track of her frequent rest breaks.  According to Plaintiff, Rogers told her that "she had never had an employee who was required to take frequent breaks as I was required to by my medical restrictions."  Pl.'s Decl. ¶ 58.  Rogers told her

14

that the purpose of the forms was to find Plaintiff a job that took into account her need to take frequent breaks, but Plaintiff was concerned about the forms for several reasons.  Pl.'s Decl. ¶ 59.  She considered them to be a record of her medical condition, so the forms should not have been kept "in the open on a table next to her desk," and she felt the nature of the work determined how often she needed a break, so that it was not possible for her to tell Rogers in advance when she needed a break.  Pl.'s Decl. ¶¶ 60-61.

### 4.    *District Reasonable Accommodation Committee*

According to Kokubun, after April 30, 2006, Plaintiff stated that she was unable to perform any portion of any of the five duties listed in the April 25, 2006 offer, with or without accommodation.  As a result, she was no longer given any of those duties.  Kokubun Decl. ¶ 18.  She was then referred to the Honolulu District Reasonable Accommodation Committee ("DRAC").  *Id.*  The DRAC determines "whether an employee's impairment affected a major life activity, and if so, whether the employee could perform the essential functions of a vacant Postal Service position with or without reasonable accommodations."  Santos Decl. ¶ 2.

On June 20, 2006, Plaintiff wrote to Frank Santos ("Santos"), the Postmaster in charge of overseeing Honolulu stations and customer service

operations, and co-chairman of the Honolulu DRAC.  In the letter, Plaintiff complained that she had been denied an interactive process and was assigned to work in medically unsuitable jobs.  Pl.'s Ex. P.  Santos was not in Plaintiff's chain of supervision because she worked in processing and distribution, not customer service.  Santos Decl. ¶ 1.  The members of the DRAC committee for Plaintiff's case were Santos; Ueno; Lloyd Nakata, Manager, In-Plant Support; Dr. Robert Sussman, contract physician; and Rodney Aihara, Labor Relations Specialist. Santos Decl. ¶ 3.

Prior to the July 7, 2006 DRAC meeting, the committee reviewed the following documents: the April 25, 2006 job offer; a list of "job offer concerns" from Plaintiff; and a July 7, 2006 letter from Plaintiff requesting accommodation and explaining her medical conditions.  Santos Decl. ¶ 3.  Plaintiff's July 7, 2006 letter to the DRAC requests "a Reasonable Accommodation to perform manual distribution of letters as a Manual Processing Clerk in PL 373 in the Honolulu Processing and Distribution center with reasonable accommodation for my disabilities."  Pl's. Ex. U.

At the July 7, 2006 DRAC meeting, Plaintiff told the committee that the only job she could do was manual distribution of letters in PL 373 and would need the following accommodations: working at her own pace, taking rest breaks

whenever necessary, distributing mail using only one hand and not gripping with her thumb, and not distributing mail into the top rows of the seven-row distribution case that were above her shoulders.  Santos Decl. ¶ 2.

During the meeting, Plaintiff said that very little mail goes into the upper levels of the case located above her head that would have required her to reach above her shoulder level.  Instead, she claims, "[a]ny mail that would have gone into those locations I stacked at a lower level and when I finished, I put it in the trays for dispatch."  Pl.'s Decl. ¶ 69.  She also claims that the DRAC misunderstood her modified grip that she used on the mail, and incorrectly believed that she was not able to use her thumbs at all.  Pl.'s Decl. ¶ 73.

On July 13, 2006, the DRAC denied Plaintiff's request for reasonable accommodation in Manual Distribution.  According to Santos, the committee "unanimously determined that Ms. Kim's disabilities or impairments affected several major life activities, but that she was not capable of performing the essential functions of the manual distribution of letters job that she sought."  Santos Decl. ¶ 5.  Further, the DRAC "took into consideration [her] ability to meet distribution cut-off time and felt that [her] repetitive restrictions and muscular-skeletal disorders cannot be accommodated for this essential function."  Def.'s Ex. 6.  According to Santos, if Plaintiff had been able to perform the essential

17

functions of the position, the DRAC "would have suggested she bid for the next posted position."  Santos Decl. ¶ 9.  Further, despite Plaintiff's insistence that she could only do manual distribution work, the DRAC searched all the vacant, funded positions on Oahu for which Plaintiff might be qualified and for which she could perform the essential functions, but did not find any positions.  *Id.*

### 5.     *Out-of-Schedule Premium Pay*[6]

A USPS employee's rate of compensation varies according to the time and day of the week worked; those days or time-slots compensated at a higher rate are termed "premium pay."  Beginning June 15, 2002, the USPS changed the hours of all the workers assigned to PL 373 Manual Distribution, including Plaintiff, from their original 3:00 p.m. until 11:30 p.m. shift to 6:30 p.m. until 3:00 a.m.  Kokubun Decl. ¶ 19.  Plaintiff filed grievances requesting out-of-schedule premium pay for this and other schedule changes, which Kokubun denied. Kokubun Decl. ¶ 20.

The court previously denied Defendant's motion for summary judgment "as to the Plaintiff's discrimination claims relating to lost holiday work

---

[6] The facts relevant to Plaintiff's out-of-schedule premium claims are more fully set forth in the court's January 29, 2007 Order.  *See Kim*, 474 F. Supp. 2d at 1182-83.

and premium pay." *Kim v. Potter*, 474 F. Supp. 2d 1175, 1192 (D. Haw. 2007).[7]

Defendant now claims that all manual distribution employees in PL 373 -- not just

Plaintiff -- had their start time changed to 6:00 p.m. in June 2002.  Defendant also

claims that Plaintiff recently acknowledged at her deposition that the Department

of Labor never ruled that there was anything improper about her schedule change,

and the USPS did not dispute her entitlement to benefits.  Further, according to

Defendant, the USPS Employee-Labor Relations Manual ("ELRM") provides that

---

[7] The court found that Plaintiff met her burden opposing summary judgment by offering circumstantial evidence tending to show that the USPS's proffered non-discriminatory reason for the out-of-schedule premium denials was unworthy of credence.  The court concluded:

> Kim's strongest evidence of pretext is that the USPS continually denied her holiday work and assigned her out of schedule-even after agreements and settlements had been reached which granted Kim the right to this work. . . .  Kim also filed a Department of Labor claim regarding lost premium pay.  Only a day later, Kokobun and Tomooka assigned Kim out of schedule, causing her to lose additional hours compensated at the premium pay rate.  This claim was settled on June 21, 2002, and the very next day Tomooka once again assigned Kim out of schedule.  Kokobun did the same thing in August 2002.  Indeed, Kim alleges that she was continuously placed out of schedule -- the precise wrong her settlement agreement had been designed to address -- from June 2002 to December 2005.  At best, denying Kim holiday work and assigning her out of schedule against a just-finalized settlement agreement demonstrates an utter lack of organization and poor administration.  At worst, when viewing this evidence in the light most favorable to Kim, these actions evince a hostility on the part of Kokobun and Tomooka towards Kim.  This hostility calls into question the USPS's explanation of events.  Thus, the court finds that Kim has offered circumstantial evidence tending to show that USPS's proffered non-discriminatory explanation is unworthy of credence.

*Kim*, 474 F. Supp. 2d at 1190.

employees are not entitled to out-of-schedule premium pay when they are "assigned . . . as required by [FECA]."  Kokubun Decl. ¶20 (*quoting* ELRM § 434.622(f)).[8]  Therefore, because Plaintiff was temporarily assigned to Manual Distribution as part of the limited duty program for employees receiving FECA benefits, she was barred from receiving out-of-schedule premium pay.

## B.    Procedural Background

Plaintiff filed her original complaint in this action on May 18, 2005.[9]  On January 29, 2007, the court granted partial summary judgment to Defendant on Plaintiff's First Amended Complaint as follows:

> The court GRANTS the Defendant's Motion to Dismiss for time-barred claims and also GRANTS the Defendant's Motion for Partial Summary Judgment as to the Plaintiff's discrimination claims arising from administrative errors and failure to provide an automatic push-button garage gate opener; the Plaintiff's accommodation claim; and the Plaintiff's hostile work environment claims.  The court DENIES the Defendant's Motion for Partial Summary Judgment as to the Plaintiff's discrimination claims relating to lost holiday work and premium pay.
>
> In light of the court's ruling, the following claims remain: (1) the claims as set forth in paragraph 25 of Kim's

---

[8] According to Kokubun, the CBA incorporates the ELRM by reference.  Kokubun Decl. ¶ 20.

[9] Plaintiff originally filed her complaint jointly with Ernest Ho ("Ho").  The court granted Defendant's motion for summary judgment as to Ho's claims on April 26, 2006.  *See Kim v. Potter*, 460 F. Supp. 2d 1175, 1194 (D. Haw. 2006).

> Complaint; and (2) the discrimination claims relating to the denial of holiday work, lost premium pay due to out-of-schedule assignments, and denial of premium pay due to schedule changes.

*Kim*, 474 F. Supp. 2d at 1192.

On May 2, 2007, Plaintiff filed her Second Amended Complaint ("Complaint"), which includes the identical claims dismissed in her original complaint, but adds new claims that occurred after December 2006, particularly regarding her desire to return to Manual Distribution. Defendant groups these new claims into the following six categories and seeks dismissal or summary judgment as to each of them:

(1)     USPS discriminated against Plaintiff in December 2005 when she was permanently assigned the Times Web position, Compl. ¶ 25;

(2)     Plaintiff's April 25, 2006 rehabilitation job offer was made contrary to postal rules and regulations, and substantially changed her working conditions, denying her overtime and holiday opportunities, Compl. ¶ 26;

(3)     Plaintiff was denied "the interactive process" during the March 2005 job offer, Compl. ¶ 27;

(4)     From April 25 to 29, 2006, Plaintiff was denied union representation when the USPS offered her a new position, Compl. ¶ 28;

21

(5)  In May and June 2006, Plaintiff was required by Rogers to keep record of her frequent breaks, Compl. ¶ 29; and

(6)  Plaintiff's rights were violated in July 2006 when the DRAC did not grant her request for work in Manual Distribution and denied her further work, Compl. ¶¶ 32-35.

Defendant now seeks dismissal of Plaintiff's claims related to the December 2005 assignment because Plaintiff failed to exhaust her administrative remedies by failing to contact an EEO counselor within 45 days.  With respect to Plaintiff's request for reasonable accommodation, Defendant seeks summary judgment on three grounds: (1) the USPS is only required to reassign an employee to an existing position, not create a new one, and there was no vacant position in Manual Distribution for which Plaintiff was qualified; (2) the DRAC reasonably determined that Plaintiff was unable to perform the essential functions of Manual Distribution; and (3) Plaintiff's claim is barred because the OWCP determined that the Times Web position was suitable for Plaintiff.  As to Plaintiff's claims that she was denied an interactive process (or other conduct in violation of USPS rules and regulations), Defendant asks the court to dismiss for lack of subject matter jurisdiction, or in the alternative, to grant summary judgment to the extent these claims allege her disability was not reasonably accommodated.  Defendant also

22

seeks summary judgment on Plaintiff's claims regarding the denial of union representation and the requirement that she record breaks because neither constitutes an adverse personnel action, nor were they motivated by discriminatory animus.  Lastly, Defendant asks the court to renew its rulings on matters addressed in its previous orders, but requests that the court now grant summary judgment on Plaintiff's out-of-schedule premium claim based on evidence revealed in recent discovery.

Plaintiff filed her Opposition on November 29, 2007.  Plaintiff's Opposition does not address Defendant's arguments that (1) she failed to exhaust administrative remedies with respect to the December 2005 assignment; (2) the denial of union representation and the requirement that she record breaks are not adverse personnel actions, and were not motivated by discriminatory animus; or (3) the court should renew its rulings on claims addressed in previous orders, with the exception of Plaintiff's claims for out-of-schedule premium, which should be revisited.

Defendant filed a Reply on December 6, 2007.  A hearing was held on December 17, 2007.  Based on the following, the court GRANTS in part and DENIES in part Defendant's motion.

# III.  STANDARDS OF REVIEW

## A.    Motion to Dismiss

Under Federal Rule of Civil Procedure 12(b)(1), a court will dismiss claims over which it lacks proper subject matter jurisdiction.  When considering a motion to dismiss for lack of proper subject matter jurisdiction, the court may review supplemental materials necessary to resolve jurisdictional fact issues.  *See Ass'n of Am. Med. Colls. v. United States*, 217 F.3d 770, 778 (9th Cir. 2000).  However, where the jurisdictional question is intertwined with the merits of the case, the court will treat the motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1) as a motion for summary judgment under Rule 56.  *See Augustine v. United States*, 704 F.2d 1074, 1077 (9th Cir. 1983).  The moving party "should prevail [on a motion to dismiss] only if the material jurisdictional facts are not in dispute and the moving party is entitled to prevail as a matter of law."  *Casumpang v. Int'l Longshoremen's & Warehousemen's Union*, 269 F.3d 1042, 1060-61 (9th Cir. 2001) (citation and quotation signals omitted).

## B.    Summary Judgment

A party is entitled to summary judgment as to any claim where there is no genuine issue as to any material fact contained in the pleadings, depositions, answers to interrogatories, admissions or affidavits.  Fed. R. Civ. P. 56(c).  "One

24

of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986).  When reviewing a motion for summary judgment, the court construes the evidence -- and any dispute regarding the existence of facts -- in favor of the party opposing the motion. *Snead v. Metro. Prop. & Cas. Ins. Co.*, 237 F.3d 1080, 1086 (9th Cir. 2001).  The moving party bears the initial burden of showing that there is no factual dispute regarding those claims for which summary judgment is sought. *See T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).  Nevertheless, "summary judgment is mandated if the non-moving party 'fails to make a showing sufficient to establish the existence of an element essential to that party's case.'" *Broussard v. Univ. of Cal. at Berkeley*, 192 F.3d 1252, 1258 (9th Cir. 1999) (*quoting Celotex*, 477 U.S. at 322).

## IV.  ANALYSIS

### A.    Failure to Exhaust Administrative Remedies

In order to bring a claim under the Rehabilitation Act, a plaintiff must first exhaust her administrative remedies.  Under 29 C.F.R. § 1614.105(a), "aggrieved persons who believe they have been discriminated against on the basis of . . . handicap must consult [an EEOC] Counselor prior to filing a complaint in

order to try to informally resolve the matter."  This consultation must occur within

45 days of the perceived violation of the plaintiff's rights.  29 C.F.R.

§ 1614.105(a)(1).  "The time period for filing a complaint of discrimination begins

to run when the facts that would support a charge of discrimination would have

been apparent to a similarly situated person with a reasonably prudent regard for

his rights."  *Boyd v. U.S. Postal Serv.*, 752 F.2d 410, 414 (9th Cir. 1985).  If a

plaintiff fails to timely file her complaint within the applicable 45-day period, her

discrimination claims are time-barred and will be dismissed.  *Lyons v. England*,

307 F.3d 1092, 1105 (9th Cir. 2002); *see also Cherosky v. Henderson*, 330 F.3d

1243, 1245 (9th Cir. 2003) ("Failure to comply with this regulation is 'fatal to a

federal employee's discrimination claim.'" (*quoting Lyons*, 307 F.3d at 1105)).

Following the December 17, 2007 hearing, the parties submitted a

Joint Statement Regarding Exhaustion of Administrative Remedies Issues, dated

December 21, 2007.  The parties agree "that claims arising from the December 3,

2005 reassignment, as referred to in Paragraph 25 of the Second Amended

Complaint, are barred for failure to exhaust administrative remedies."  The court

therefore GRANTS Defendant's motion with respect to Plaintiff's claims based on

the December 2005 reassignment.

## B.      Reasonable Accommodation Claim

Defendant seeks summary judgment with respect to Plaintiff's

reasonable accommodation claim on the grounds that (1) she failed to show that

there was a vacant Manual Distribution position to which the USPS was obligated

to reassign her; (2) Plaintiff was not qualified for a Manual Distribution position

because she could not perform the job's essential functions; and (3) because

OWCP determined the Times Web position was a suitable position, the court lacks

subject matter jurisdiction over Plaintiff's reasonable accommodation claim.[10]

///

///

_____

[10] Under *Meester v. Runyon*, 149 F.3d 855, 857 (8th Cir. 1998), this court cannot adjudicate a matter committed to the sole discretion of the Department of Labor under FECA where that matter is specifically addressed by OWCP in a disability claim determination. In a September 28, 2005 letter, OWCP informed Plaintiff that it determined that the Times Web position was suitable. As a result, this court cannot review this decision. But that specific issue is not before the court -- the parties agree that Plaintiff's claim regarding the December 2005 Times Web position was not exhausted, *see supra*, section VI.A, and is therefore not before the court.

Defendant, however, argues for an extension of *Meester*, claiming that this court lacks subject matter jurisdiction over Plaintiff's claims in ¶¶ 26-27 and 32-35 of the Complaint, which are based on the April 2006 job offer and the DRAC proceedings. Def.'s Reply 7-8. In essence, Defendant claims that an OWCP suitability finding bars all Rehabilitation Act claims, not just the claim relating to the specific suitability determination.

Even if *Meester* could have broader application as Defendant suggests, the facts before the court do not support such an extension. For instance, *Meester* certainly could not be extended if a plaintiff's medical conditions materially changed between the time of the suitability determination and the later complaint of discrimination. Here, by April and May 2006, Plaintiff claimed greater disability by way of additional restrictions on the work she could do. *See* Def.'s Ex. 4. Under the circumstances, the court will not expand *Meester*'s holding in the manner suggested by Defendant.

### 1.   Legal Framework

The standards used to determine whether an act of discrimination violated the Rehabilitation Act are the same standards applied under the Americans with Disabilities Act ("ADA").  *See* 29 U.S.C. § 794(d); *Coons v. Sec'y of U.S. Dep't of Treasury*, 383 F.3d 879, 884 (9th Cir. 2004).  The court applies the burden-shifting framework from *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  *See Raytheon Co. v. Hernandez*, 540 U.S. 44, 49-50 (2003) (applying *McDonnell Douglas* burden shifting framework to ADA disability discrimination claim).  To state a prima facie case under the Rehabilitation Act, Plaintiff must demonstrate that (1) she is a person with a disability, (2) who is otherwise qualified for employment with or without reasonable accommodation, and (3) suffered discrimination because of her disability.  *Walton v. U.S. Marshals Serv.*, 492 F.3d 998, 1005 (9th Cir. 2007).

The Rehabilitation Act "requires that government agencies reasonably accommodate an employee's disability."  *McLean v. Runyon*, 222 F.3d 1150, 1153 (9th Cir. 2000).  Plaintiff has the "burden of showing the existence of a reasonable accommodation that would have enabled [her] to perform the essential functions of an available job.  To avoid summary judgment, however, [Plaintiff] need only show that an 'accommodation' *seems reasonable on its face*,

i.e., ordinarily or in the run of cases." *Dark v. Curry County*, 451 F.3d 1078, 1088

(9th Cir. 2006) (citation and quotation signals omitted). Although the "burden of

persuasion in proving inability to accommodate always remains on the employer,

once the employer presents credible evidence that accommodation would not

reasonably be possible, the plaintiff has the burden of coming forward with

evidence concerning her individual capabilities and suggestions for possible

accommodations to rebut the employer's evidence." *Mantolete v. Bolger*, 767

F.2d 1416, 1424 (9th Cir. 1985).

Under the regulations implementing the ADA, reasonable

accommodation is defined in part as "modifications or adjustments to the work

environment, or to the manner or circumstances under which the position held or

desired is customarily performed, that enable a qualified individual with a

disability to perform the essential functions of that position."  29 C.F.R.

§ 1630.2(o)(1)(ii).  Reasonable accommodation may include but is not limited to:

> Job restructuring; part-time or modified work schedules;
> reassignment to a vacant position; acquisition or modifications
> of equipment or devices; appropriate adjustment or
> modifications of examinations, training materials, or policies;
> the provision of qualified readers or interpreters; and other
> similar accommodations for individuals with disabilities.

29 C.F.R. § 1630.2(o)(2)(ii).

29

Throughout the relevant time period, Plaintiff made it clear that the only position she was interested in was assignment to Manual Distribution -- even though the USPS attempted to assign her to other positions and continued to search for other positions as a reasonable accommodation for Plaintiff.  The court first addresses Defendant's claim that there was no vacant position in Manual Distribution.

### 2.    *No Vacant Position*

A reasonable accommodation includes reassignment to a vacant position.  *McLean*, 222 F.3d at 1153 (*citing* 42 U.S.C. § 12111(9)(B)).  "[I]n considering reassignment as a reasonable accommodation, an employer must consider not only those contemporaneously available positions but also those that will become available within a reasonable period."  *Dark*, 451 F.3d at 1089-90.

According to Defendant, from December 2005 (when Plaintiff agreed to move from her temporary manual distribution position to the Times Web position), through the present, there have been no vacant positions in Manual Distribution for which Plaintiff would have been qualified if she had applied.  *See* Kaetano Decl. ¶¶ 3-4.  Nor was Defendant required to create a new position in Manual Distribution for Plaintiff.  *See Soone v. Kyo-Ya Co.*, 353 F. Supp. 2d 1107, 1113 (D. Haw. 2005) ("The employer does not have to bump an employee from a

job in order to create a vacancy; nor does it have to create a new position." (citation omitted)).

At the December 17, 2007 hearing, Plaintiff agreed that no vacant position was available. Further, Plaintiff has not presented evidence showing that there was likely to be a vacant position available that she was capable of performing.[11] *See Phelps v. Optima Health, Inc.*, 251 F.3d 21, 27 (1st Cir. 2001) (Employee "bears the burden of proof in showing that such a vacant position exists."); *McCreary v. Libbey-Owens-Ford Co.*, 132 F.3d 1159, 1165 (7th Cir. 1997) ("Occasional opportunities to work in another department are not equivalent to a vacancy for a permanent position. Pointing to a current vacancy is required[.]"); *Chapman v. UPMC Health Sys.*, 516 F. Supp. 2d 506, 529 (W.D. Pa. 2007) ("A plaintiff must adduce evidence that there is a vacant, funded position she is capable of performing." (*quoting Shiring v. Runyon*, 90 F.3d 827, 832 (3d Cir. 1996)).

Instead, Defendants have demonstrated that there were no vacant positions in Manual Distribution and would not likely be any within a reasonable

---

[11] Unlike the plaintiff in *Dark v. Curry County*, 451 F.3d 1078, 1089 (9th Cir. 2006), whose affidavit stated that "there were a number of open positions for which he was qualified around the time of his discharge," Plaintiff does not present any evidence of likely future vacancies in Manual Distribution.

period because the department was being downsized due to increasing automation. In fact, as of September 2007, there was no work at all for permanent or limited duty employees in Manual Distribution.  Second Kokubun Decl. ¶ 2.  According to Santos, if Plaintiff had been able to perform the essential functions of the position, the DRAC "would have suggested she bid for the next posted position."  Santos Decl. ¶ 9.  Further, despite Plaintiff's insistence that she could only do manual distribution work, the DRAC searched all the vacant, funded positions on Oahu for which Plaintiff might be qualified and for which she could perform the essential functions, but did not find any positions.  *Id.*

To the extent Plaintiff argues that she is entitled to a permanent position in Manual Distribution because she previously held a temporary limited duty there, the court rejects this argument.  An employer who has created a temporary assignment is not obligated to transform the position into a permanent one.  *See Sevcik v. Unlimited Constr. Servs.*, 462 F. Supp. 2d 1140, 1148-49 (D. Haw. 2006) (holding that even if temporary light duty positions were becoming available, "Defendant has no obligation to make these positions permanent to accommodate Plaintiff's disability").  "To find otherwise would unacceptably punish employers from doing more than the ADA requires, and might discourage such an undertaking on the part of employers."  *Rehrs v. Iams Co.*, 486 F.3d 353,

32

358 (8th Cir. 2007) (citation omitted).  *See also Fjellestad v. Pizza Hut of Am., Inc.*, 188 F.3d 944, 950 (8th Cir. 1999) (An employer is not "required to create a new position or to create a permanent position out of a temporary one as an accommodation."); *Mengine v. Runyon*, 114 F.3d 415, 418 (3d Cir. 1997) ("The Postal Service was not required to transform its temporary light duty jobs into permanent jobs to accommodate [plaintiff's] disability."); *Staub v. Boeing Co.*, 919 F. Supp. 366, 370 (W.D. Wash. 1996) ("The ADA does not impose a duty upon [defendant] to create a new, permanent position for [plaintiff] in this otherwise temporary-placement position.").[12]

Plaintiff claims that the only job that would accommodate her disability was in Manual Distribution (with accommodations).  But she failed to prove, and in fact admits, that there were no vacant positions in Manual

---

[12] Although Plaintiff is correct that *Woodman v. Runyon*, 132 F.3d 1330, 1343 (10th Cir. 1997), holds that the USPS has "greater duties to accommodate disabled workers" under section 501 of the Rehabilitation Act than under the ADA, *Woodman* does not establish an affirmative duty under the Rehabilitation Act to create a new position or make a temporary position permanent.  Further, *Woodman* is factually distinct.  A USPS Labor Relations Specialist in *Woodman* conceded that the CBA did not expressly prohibit reassignment to the bid position sought by the plaintiff.  *Id.* at 1347.  No such concession exists here.  Plaintiff does not dispute Kokubun's statement that "the Postal Service could not permanently assign her to a bid position in Manual Distribution because, under the CBA, the Postal Service would have had to first post the vacant position for bid and award it to the most senior qualified candidate."  Kokubun Decl. ¶ 8; Pl.'s Separate & Concise Statement of Facts at 2.

Distribution during the relevant time periods.  In short, Plaintiff has not

demonstrated that a reasonable accommodation was possible in Manual

Distribution, the only place she was willing to work.

### 3.     *Whether Plaintiff Could Perform Essential Functions*

Even assuming that a vacant position could have existed in Manual

Distribution, Plaintiff has not demonstrated that in July 2006 she was qualified for

the position, with or without accommodation.  "The term essential functions

means the fundamental job duties of the employment position the individual with a

disability holds or desires.  The term 'essential functions' does not include the

marginal functions of the position."  29 C.F.R. § 1630.2(n)(1).  A court should

consider the employer's judgment as to what the essential functions of the job are.

42 U.S.C. § 12111(8); *see also* 29 C.F.R. § 1630.2(n)(2)(i-iii).  Plaintiff bears the

burden to demonstrate that she can perform the essential functions of the job, with

or without reasonable accommodation.  *Kennedy v. Applause*, *Inc.*,  90 F.3d 1477,

1481 (9th Cir. 1996).

In May 2006, Plaintiff submitted lists of "job offer concerns"

indicating that she was not able to lift and carry trays, do data entry, squat, bend

kneel, move her head up and down, push or pull equipment, or sit at a high desk or

work station.  *See* Def.'s Ex. 4.  Plaintiff's August 2006 functional capacity

34

evaluation indicates that Plaintiff may be able to work "at a sedentary level."  Pl.'s Ex. S.

Plaintiff has not demonstrated that she could perform manual distribution work even with her requested accommodations.  Plaintiff's July 7, 2006 letter to the DRAC states that both hands would become numb upon gripping, both thumbs became numb by prolonged motion, and that "the physical motions -- gripping, lifting (even less than 20#), moving shoulders, bending," caused pain to all parts of her body.  Def.'s Ex. 5.  Her July 7, 2006 letter contains further limitations including: no prolonged sitting, standing, or walking; no repetitive bending, squatting, or kneeling; no twisting, reaching, or working overhead; and finally, no repetitive or prolonged hand movements.  *Id.*

The essence of the Manual Distribution position Plaintiff sought is repetitive hand motion.  The DRAC concluded that Plaintiff could not perform the essential functions of the job because of her own stated limitations.  Plaintiff insists, however, that the DRAC determination was in error.

Plaintiff told the DRAC that she had previously worked in Manual Distribution with accommodations, and was able to sort the mail into the upper rows by setting it aside until completing the mail in the lower rows, and grasped the mail without using the "pencil grip" utilized by the USPS.  She insisted that

she did not "double handle" the mail, but Kokubun explained that her method was, in fact, considered "double handling" because Plaintiff "would have to go through the stack on the ledge again to distribute it into the outbound trays.  This method would be considerably slower than one using . . . all the slots in the case."  Second Kokubun Decl. ¶ 7.

The DRAC considered Plaintiff's ability to meet distribution cut-off time and concluded that her repetitive restrictions and muscular-skeletal disorders could not be accommodated for this essential function.  *See* Def.'s Ex. 6.  Even construing the facts in the light most favorable to the non-moving party, Plaintiff has not met her burden of proving that she is "qualified."

In sum, because the court concludes that there was no vacant position in Manual Distribution for which Plaintiff was qualified to perform, Defendant's motion is GRANTED with respect to Plaintiff's reasonable accommodation claim.

## C.     April 2006 Job Offer and Lack of Interactive Process

Defendant seeks dismissal and/or summary judgment on the claims set forth in paragraphs 26 and 27 of Plaintiff's Complaint, which allege that the April 2006 rehabilitation job offer was made contrary to postal rules and regulations because she was denied the interactive process.  Defendant argues that

the court should not recognize a stand-alone cause of action for failure to engage in the interactive process.

An employer has "an affirmative obligation to engage in an interactive process in order to identify, if possible, a reasonable accommodation[.]" *Dark*, 451 F.3d at 1088; *see also* 29 C.F.R. § 1630.2(o)(3) ("To determine the appropriate reasonable accommodation it may be necessary for the covered entity to initiate an informal, interactive process with the qualified individual with a disability in need of the accommodation. This process should identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations.").

Plaintiff alleges that Defendant did not properly engage in the interactive process by consulting her doctors before the April 2006 job offer. Defendant claims that even if the interactive process was not properly conducted, it is entitled to summary judgment because no reasonable accommodation was possible. The court agrees. Even if the USPS "did not engage in any such process, summary judgment is available only if a reasonable finder of fact *must* conclude that there would in any event have been no reasonable accommodation available." *Dark*, 451 F.3d at 1088 (citation and quotation signals omitted); *see also Kramer v. Tosco Corp.*, 233 Fed. Appx. 593, 596 (9th Cir. 2007) ("[I]f a

37

disabled person cannot perform a job's 'essential functions' (even with a reasonable accommodation), then the ADA's employment protections do not apply.  [Plaintiff's] proposed instruction would have misled the jury into erroneously believing that there existed an independent cause of action for failing to engage in the interactive process." (citation and quotation signals omitted)); *Humphrey v. Mem'l Hosps. Ass'n*, 239 F.3d 1128, 1137-38 (9th Cir. 2001) ("Employers, who fail to engage in the interactive process in good faith, face liability for the remedies imposed by the statute if a reasonable accommodation would have been possible.").[13]

Further, although the purpose of the interactive process is to identify and to develop a reasonable accommodation, Plaintiff herself limited the positions she would consider to Manual Distribution, effectively eliminating the possibility of identifying other reasonable accommodations.  Because the court finds that no reasonable accommodation was possible under the unique circumstances of this case where no position was vacant and Plaintiff was not qualified to work in Manual Distribution, the court GRANTS Defendant's motion.

---

[13] Although Plaintiff relies heavily on *Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296 (3d Cir. 1999), for the proposition that failure to engage in the interactive process precludes summary judgment, *see* Pl.'s Opp'n 22-24, the Third Circuit later distinguished *Taylor* in *Donahue v. Consol. Rail Corp.*, 224 F.3d 226, 235 (3rd Cir. 2000), to situations where there is a "universe of potential accommodations" and no interactive process.

**D.     Denial of Union Representation and Break Recording Requirement**

Defendant moves for summary judgment on Plaintiff's claims that she was denied union representation when the USPS requested that she accept a position that exceeded her limitations, Compl. ¶ 28, and that in May and June 2006, she was required "to keep a record of her frequent breaks that were allowed because of her limitations." Compl. ¶ 29. Defendant argues that neither action constitutes an adverse employment action, nor was either motivated by a discriminatory motive. Plaintiff did not respond to these arguments in her Opposition.

To the extent these allegations state claims for disability discrimination and retaliation, the court applies the *McDonnell Douglas* burden-shifting framework. To state a prima facie case of disability discrimination under the Rehabilitation Act, a plaintiff must demonstrate that (1) she is a person with a disability, (2) who is otherwise qualified for employment, and (3) suffered an adverse employment action because of her disability. *See Walton*, 492 F.3d at 1005. "A prima facie case of retaliation requires a plaintiff to show: (1) involvement in a protected activity, (2) an adverse employment action and (3) a causal link between the two." *Coons*, 383 F.3d at 887 (citation and quotation signals omitted). Once the plaintiff establishes a prima facie case, the employer

39

has the burden to present legitimate reasons for the adverse employment action.

*Id.*  If the employer carries this burden, and a plaintiff demonstrates a genuine issue of material fact as to whether the reason advanced by the employer was pretextual, then the case proceeds beyond the summary judgment stage.  *Id.*

### 1.    *Denial of Union Representation*

Around the time she received the April 25, 2006 job offer, Plaintiff claims she asked for a union shop steward and was told that she had an appointment with steward Morales on April 28, 2006.  Pl.'s Decl. ¶ 34.  When Plaintiff arrived at work on April 28, 2006, Morales was not there.  Pl.'s Decl. ¶ 35.  The next day, April 29, 2006, Plaintiff was supposed to begin in the new position, but instead, clocked in at her old location and inquired about her meeting with Morales.  Pl.'s Decl. ¶ 36.  She was told by another employee that Morales "had been on annual leave."  *Id.*  According to Plaintiff, "[w]hen I finally did talk to Morales on Sunday, April 30, 2006, I learned that I was going to be removed for insubordination because I refused to sign the job offer."  Pl.'s Decl. ¶ 37.

Defendant argues that the alleged denial of union representation does not rise to the level of an adverse employment action.  As to her claim of discrimination, Plaintiff must demonstrate that she suffered adverse personnel actions which materially affect the terms, conditions, or privileges of her

40

employment.  42 U.S.C. § 2000e-2(a)(1).  As to retaliation, adverse employment action is defined more broadly.  *See, e.g.*, *Burlington N. & Santa Fe Ry. Co. v. White*, 126 S. Ct. 2405, 2415 (2006) (holding in a Title VII case that "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." (quotation signals omitted)).  While petty slights or minor annoyances are not actionable simply because an employee has reported discrimination, the significance of any given act of retaliation will often depend on the circumstances.  *Id.* at 2415.

Plaintiff has set forth no evidence demonstrating that the alleged denial of union representation was an adverse employment action.  The fact that Morales was out on "annual leave" during the time Plaintiff alleges she had an appointment to see him does not appear to be materially adverse and Plaintiff did, in fact, meet with Morales two days later on April 30, 2006.  Further, it is not clear that such conduct is even attributable to Defendant.  Thus, Defendant is entitled to summary judgment because Plaintiff has not demonstrated a genuine issue of material fact concerning an element of her prima facie case for discrimination and retaliation.  Further, even if the allegations rose beyond the level of trivial,

Plaintiff has not shown any discriminatory animus on the part of the USPS, or that Defendant's stated rationale is not worthy of credence. The court GRANTS Defendant's motion as to this claim.

### 2.   Requirement That Plaintiff Record Her Breaks

Plaintiff claims that in May and June 2006, Rogers began to require her to keep track of her frequent rest breaks. Rogers told her that the purpose of the forms was to find Plaintiff a job that took into account her need to take frequent breaks, but Plaintiff was concerned about the forms for several reasons. Pl.'s Decl. ¶ 59. Because Plaintiff considered them to be a record of her medical condition, she felt the forms should not have been kept "in the open on a table next to her desk." Pl.'s Decl. ¶¶ 60-61. Defendant argues that given Plaintiff's admission that she took longer and additional breaks than permitted by contract, the break-recording requirement was reasonable.

The record shows that Plaintiff was neither denied breaks nor needed to get permission to take breaks, but she had to record the start and stop time for each break she took. Pl.'s Decl. ¶ 59. Such a restriction is not likely to deter a reasonable employee from making or supporting a charge of discrimination. *See Boykins v. Lucent Tech., Inc.*, 78 F. Supp. 2d 402, 414 (E.D. Pa. 2000) ("[S]imply being observed at work, without more, does not rise to the level of an adverse

employment action."); *Mihalko v. Potter*, 2003 WL 23319594, at *6 (W.D. Pa. Dec. 12, 2003) (finding that the plaintiff's allegations that he was publicly reprimanded, monitored by his employer, and denied lunch breaks do not constitute adverse employment actions). *But see Soto v. John Morrell & Co.*, 285 F. Supp. 2d 1146, 1162 (N.D. Iowa 2003) (finding a genuine issue of material fact as to whether the denial of bathroom breaks, or whether giving plaintiff shorter bathroom breaks than other female coworkers on the same line, constituted adverse employment action).

Even assuming that such conduct could constitute an adverse employment action, Plaintiff has not rebutted Defendant's non-discriminatory reason by showing that the proffered explanation ("Rogers told me that the purpose of the forms was to find me a job that I could do that took into account my need to take frequent breaks," Pl.'s Decl. ¶ 59) is unworthy of credence, or that Rogers was motivated by discriminatory or retaliatory animus.

As a result, the court GRANTS Defendant's motion for summary judgment on Plaintiff's claims that she was denied union representation and was required to record her breaks.

///

///

43

**E.      Effect of the Court's Earlier Rulings**

To the extent Plaintiff's Complaint repeats claims that the court previously ruled upon, the court renews its previous holdings.

To the extent Defendant asks the court to reconsider its previous ruling regarding Plaintiff's out-of-schedule premium claim -- but offers no explanation why evidence was not previously available to Defendant -- the court declines to do so.

## V.  CONCLUSION

The court GRANTS Defendant's motion as to Plaintiff's claims regarding the December 2005 job offer; lack of reasonable accommodation; failure to properly conduct interactive process; denial of union representation; and break-recording requirement.  The court DENIES Defendant's motion to the extent it seeks to reopen the court's previous ruling regarding Plaintiff's out-of-schedule premium claim.

///

///

///

///

///

The following claims remain for trial: (1) Plaintiff's claims related to two letters of warning issued to Plaintiff, *see* Compl. ¶¶ 30-31; and (2) claims relating to the denial of holiday work, lost premium pay due to out-of-schedule assignments, and denial of premium pay due to schedule changes.  *See Kim*, 474 F. Supp. 2d at 1192.

IT IS SO ORDERED.

DATED:  Honolulu, Hawaii, February 22, 2008.



/s/ J. Michael Seabright
J. Michael Seabright
United States District Judge

*Kim v. Potter*, Civ. No. 05-00332 JMS/LEK, Order Granting in Part and Denying in Part Defendant's Motion for Partial Dismissal and for Partial Summary Judgment